RUSHING v. SPREEN.†

(Court of Civil Appeals of Texas. Austin.
Dec. 7, 1910. On Motion for Rehearing, Oct. 25, 1911.)

1. PATENTS (§ 212*)—PATENT RIGHTS—SALE—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover the price paid for patent rights on the ground of fraudulent misrepresentations, held not to sustain a finding that the sale to K. of the right to sell the patented article in a certain state was induced by fraudulent representations.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 212.*]

2. PLEADING (§ 290*) — SWORN DENIALS — "PARTNERSHIP"—"CO-CONSPIRATOR."

In an action to recover money and property claimed to have been paid for patent rights, sold plaintiff by several defendants conspiring together to defraud him and induce him to purchase by fraudulent representations, allegations that defendant R. was a "partner" in the unlawful scheme did not allege such a partnership as the statute requires to be denied under oath; the word "partner" as used being synonymous with "co-conspirator."

[Ed. Note.—For other cases, see Pleading, Dec. Dig. § 290.*

For other definitions, see Words and Phrases, vol. 6, pp. 5191–5202; vol. 8, pp. 7746, 7747.]

On Motion for Rehearing.

3. APPEAL AND ERROR (§ 1008*)—FINDINGS—CONCLUSIVENESS — FINDINGS BY THE COURT.

Findings of fact made by the court should be given the same weight on appeal as special findings made by a jury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3955–3969; Dec. Dig. § 1008.*]

4. PATENTS (§ 212*)—PATENT RIGHTS—SALE—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover the price paid for patent rights, claimed to have been sold to plaintiff by fraudulent representations, held to sustain a finding that the patented article was a worthless invention.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 212.*]

5. PATENTS (§ 212*)—PATENT RIGHTS—SALE—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover the price paid for patent rights, claimed to have been sold to plaintiff by fraudulent representations, held to sustain a finding that the sale of the right to sell the patented article in a certain state to P. and others was fraudulent.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 212.*]

6. PATENTS (§ 212*)—PATENT RIGHTS—SALE—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover the price paid for patent rights, held to sustain a finding that the sale of certain patent rights to H. was induced by false representations by one of defendants.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 212.*]

7. APPEAL AND ERROR (§ 750*)—ASSIGNMENTS OF ERROR.

Where appellant did not assign error upon the specific findings of fact made, only the sufficiency of the evidence to sustain the judgment can be considered on appeal; the proper judgment having been rendered if the facts were as found by the court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3079; Dec. Dig. § 750.*]

8. PATENTS (§ 212*)—PATENT RIGHTS—SALE—VALIDITY—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover the price paid by plaintiff for patent rights which he

the patented article in a certain state was induced by fraudulent representations.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 212.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

142 S.W.—4    † Writ of error denied by Supreme Court December 13, 1911.

was fraudulently induced to purchase, *held* to sustain a finding that the appealing defendant was connected with the fraudulent conduct of the others so as to make him responsible therefor.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 212.*]

Key, C. J., dissenting.

Appeal from District Court, Austin County; L. W. Moore, Judge.

Action by H. F. Spreen against C. C. Rushing and others. From a judgment for plaintiff, defendant named appeals. Affirmed on rehearing.

J. S. Bounds and Mathis, Buchanan & Stone, for appellant. C. G. Krueger, Jas. L. Storey, and John T. Duncan, for appellee.

KEY, C. J. This is the second appeal in this case, 112 S. W. 98. The nature of the suit is stated in the opinion of Mr. Chief Justice Pleasants in the volume cited, and it is not necessary to restate it, further than to say that, after the case was reversed, the plaintiff amended his petition and made C. C. Rushing a party defendant, and he filed a general denial. A judgment was rendered against both the Wittliffs and Rushing, and the latter has appealed.

The trial judge filed the following findings of fact and conclusions of law:

### "Findings of Fact.

"(1) I find that H. F. Spreen, plaintiff, and John Spreen, intervener, are resident citizens of Austin county, Tex. That T. H. Wittliff is a transient person, and that Julius Wittliff now resides in Palo Pinto county, Tex., and that C. C. Rushing resides in Bosque county, Tex.

"(2) I find that during the years 1906 and 1907 the defendant T. H. Wittliff was engaged in the sale of a patented device commonly called the 'Peacock Bed Brace,' and that he appeared to have the authority to sell county and state rights or to sell the right to persons to sell said device in any state or counties of the different states of the Union. I find that said patented device, known as the 'Peacock Bed Brace' was a worthless invention. That it was without any commercial value as an article of commerce, was unsalable upon its merits, and was not a useful mechanical contrivance.

"(3) I find that T. H. Wittliff, Julius Wittliff, C. C. Rushing, Max Holtz, one Robertson, one Montgomery, one Krause, one Williamson, one Baxter Shemwell, and other parties unknown, conspired together to cheat and defraud the public generally by the use of fraudulent devices and deceitful means to entice ignorant and unsuspecting and honest people to buy said worthless patented device and did induce such persons to buy the same at large prices. And I find as a fact that said parties who purchased said de-

vice were induced to do so by the fraudulent manipulations and representations of some one or more of the above-named parties, and that said parties who purchased said patent right were influenced to do so by the false and fraudulent representations of the above-named parties, and that said parties did not know when they made the purchase that said representations were false and fraudulent and that they were deceived by the fraudulent devices, misrepresentations, and manipulations which will be hereinafter stated.

"(4) I find that some time prior to the 19th day of December, 1906, the defendant Wittliff, aided by one Max Holtz, alias Geo. Baker, engaged the plaintiff's son, John Spreen, to work for said Wittliff at the rate of $15 per week, for the purpose of putting on bed braces—that is, putting said braces upon beds—the said witness and the said Holtz pretending to sell said bed braces. That said Wittliff and said Holtz did not sell said bed braces, but would go around and either induce persons to allow said braces to be put upon their beds free of charge, or would give the money to such parties to buy said bed braces, when the son of the plaintiff or one similarly engaged would come around to put said braces on beds. That this was done for the purpose of making the son of plaintiff believe that said pretended patented device was a good seller, was a useful mechanical contrivance, and was of great commercial value. That after the plaintiff's son had worked for the said Wittliff something like ten days or two weeks, then the said Wittliff sold to plaintiff's son, who was a very young boy, and Max Holtz, the county right of McLennan county, Tex. The said Max Holtz being a confederate of said Wittliff, but pretended to act in partnership with the plaintiff's son, and plaintiff's son being ignorant of the fact that Max Holtz was a confederate of said Wittliff, went with said Max Holtz to McLennan county and sold the county right of said McLennan county to another confederate of said Wittliff for the sum of $750. That said sale was simulated and was fraudulent, and was made for the purpose of deceiving plaintiff's son and to subsequently deceive the plaintiff. That subsequently the said Wittliff sold to Max Holtz and plaintiff's son the county right of Tarrant county; the same purpose and the same intent on the part of said Wittliff and his confederate, Max Holtz, being the same in the last sale as it was in the former, to wit, to deceive plaintiff's son and to deceive the plaintiff. That said Holtz and plaintiff's son went to Ft. Worth, where they sold the county right of Tarrant county to another confederate of said Wittliff, but plaintiff's son was not aware of the fact that said purchaser was a confederate acting with said Wittliff and said Holtz. They sold said Tarrant county at a profit of $1,500,

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

one-half of which was paid to plaintiff's son, and these acts were done by the said Wittliff and his confederates for the purpose of deceiving plaintiff's son and the plaintiff, making them believe that said worthless bed brace was a useful contrivance, was a ready seller, and of great commercial value, all of which was false, by all of which plaintiff and his son were deceived.

"(5) That thereupon the said Wittliff and his confederates having by said devices convinced the plaintiff that said worthless device was a ready and quick seller, was a useful contrivance, and of great commercial value, thereupon set out, through the aid of Max Holtz, alias Geo. Baker, to induce plaintiff to purchase, in partnership with Max Holtz, the state right of the state of Iowa and 15 counties in Wisconsin, giving to said vendees the right to sell the Peacock bed brace in said state and counties aforesaid, for a consideration of $21,000, one-half of which was to be paid by the said Max Holtz, alias Geo. Baker and the other one-half was to be paid by the plaintiff. That in this transaction the said Holtz was a confederate of said Wittliff. That the pretended sale to Holtz was false, fraudulent, and simulated. It was not intended to fix any title in the said Holtz, nor was it intended that the said Holtz was to pay any consideration therefor, but the entire scheme was for the purpose of inducing the plaintiff to part with his property. That at the instigation of said Wittliff, instead of the interest in the state of Iowa and the 15 counties in Wisconsin being conveyed direct to the plaintiff, it was made to the plaintiff's son, John Spreen, to enable the said John Spreen, who was to go to Iowa and Wisconsin to sell the patent right for the counties in said states, to more readily and easily make sales of the same; but the said John Spreen had no money or property, and the entire purchase price of said patent right was to be paid for by the plaintiff. The said Wittliff represented to the plaintiff that said patent right was a good seller, was a valuable and useful mechanical contrivance, and was of great commercial value; and he furthermore represented to and promised the plaintiff that if plaintiff's son got sick, or if Max Holtz, alias Geo. Baker, should fail to stay with him to help him sell said territory, or if plaintiff's son became dissatisfied and should be unable to sell said territory, then that the said Wittliff was to take back his said patent right and would restore and return to plaintiff all the property and money plaintiff should pay him. And the court finds that the plaintiff's son went to Iowa, found that the Peacock bed brace was worthless, was unsalable, that it had no commercial value, and he became dissatisfied after making diligent effort to sell the same, and, being unable to do so, plaintiff's son returned to Texas, having been advanced the money to do so by the plaintiff, and that Max Holtz, alias Geo. Baker, deserted the plaintiff's son in a short

time after reaching Iowa, and returned to Texas, where, under the name of Geo. Baker, he aided the said Witliff in perpetrating other frauds and swindles of a like character upon other honest, confiding and unsuspecting persons.

"(6) The court finds that the plaintiff had a daughter of comely and attractive appearance and of marriagable age, and that the defendant Wittliff, for the purpose of gaining the confidence of the plaintiff, and for the purpose of enabling the said Wittliff to more completely disarm suspicion on the part of the plaintiff, began paying attention to the plaintiff's daughter, with apparent matrimonial intentions, and engaged himself to marry said young lady, all of which was known and believed by the plaintiff and the rest of the family. But the court finds that the said Wittliff had no intention to marry the plaintiff's daughter, but used this scheme to further his fraudulent scheme and purpose of defrauding and cheating the plaintiff out of his property, and that, after he had completed the trade with plaintiff for the sale of the patent right for the state of Iowa and the counties in Wisconsin, the said Wittliff had nothing more to do with plaintiff's daughter, but left her and paid no further attention to her. That on account of said Wittliff being the accepted suitor of plaintiff's daughter, it gave the said Wittliff greater influence over the plaintiff and enabled him to more successfully accomplish his fraudulent purposes.

(7) The court finds that, in payment for said one-half interest in the Peacock bed brace for the state of Iowa and the 15 counties in Wisconsin, the plaintiff transferred and conveyed to the said T. H. Wittliff the following property: $1,500 in cash; seventeen bales of cotton of the value of $1,087.20; two vendor's lien notes, executed by one Frank Haubolt and indorsed by John Staver of the value of $1,705; four tracts of land in Austin county of the value of $5,472; three horses of the value of $495; eight head of cattle of the value of $208—aggregating $10,500. And the court finds that for this property the plaintiff received absolutely nothing in return for it, and the court finds as a fact that the plaintiff was defrauded of this amount of money and property. That the plaintiff was a common farmer, hardworking and industrious, and proved an easy subject to the circumvention and deceit of the said Wittliff.

"(8) The court finds that, within a short time after said land was conveyed to said T. H. Wittliff, he made a pretended sale of the same to his brother, Julius Wittliff, one of the defendants in this case, for a recited consideration of $5,500, $2,000 of which was recited to have been paid in cash and the notes of said Julius Wittliff to the amount of $3,500. The court finds that this sale was fraudulent and simulated as between the parties, but was done to incumber said land and to put it in such condition as to be be-

yond the reach of plaintiff, when he should discover the fraud that had been perpetrated upon him. And the court finds that the said T. H. Wittliff used the notes of his brother as collateral in borrowing money from a certain bank in the town of Taylor, Tex. And the court finds that the said Julius Wittliff was one of the co-conspirators of the defendant T. H. Wittliff, and, while the said Julius Wittliff took no part in effecting the trade between plaintiff and the said T. H. Wittliff, yet he permitted himself to be used and was used for the purpose of aiding the said T. H. Wittliff in accordance with a previous understanding to place said property beyond the reach of or the power of the said plaintiff to reclaim the same. And the court further finds that Kountz and plaintiff paid the Taylor Bank the note given by T. H. Wittliff in order to protect the vendor's lien notes that Kountz had transferred to Wittliff and the notes given by Julius Wittliff to T. H. Wittliff, which covered a lien against the 152 acres of Spreen's land, and that plaintiff paid $3,000 to protect and rescue his land, and Kountz and Spreen each paid $3,000.

"(9) The court finds that the said Wittliff, aided by some of his confederates, made a sale of the right, to sell the Peacock bed brace for the state of Illinois to one Pinter et al., who resided in Burleson county, Tex. That the patent right for said state was sold to said Pinter et al., for the sum of $30,000. And the court finds that said sale was fraudulent, and that the vendees of said patent right were deceived and defrauded of their property, and that by virtue of said fraudulent sale the said T. H. Wittliff had conveyed to him certain lands belonging to said Pinter and his associates, and that, in a very short time after the acquisition of said land, the said T. H. Wittliff conveyed said land by a deed absolute on its face to the defendant C. C. Rushing; the said Rushing claiming that the said Wittliff was indebted to him and that said land was conveyed to him as security. The court finds that, shortly after said land was conveyed to the said Rushing, he sold the same, under the direction of said Wittliff, and the notes were used and disposed of under the direction of said Wittliff. And the court finds as a fact that the vendor's lien notes amounting to $1,705, which the said Wittliff obtained from the plaintiff, Spreen, were transferred by the said Wittliff to the defendant C. C. Rushing. That the said Rushing claimed that said notes were transferred to him as collateral security for a loan of money which he made to said Wittliff, but for what amount he was unable to state.

"(10) The court finds that during the year 1907, some time during the latter part of the winter or the early part of the spring of said year, the said Wittliff by a similar fraudulent device, manipulation, scheme, and false representation, sold to one Henry Hoch of Tay-

lor, Tex., the right to sell the Peacock bed brace in the state of New York for the sum of $30,000, and that, in addition to certain cash, he received as a part of the consideration a hardware business situated in Taylor, Tex., consisting of a stock of hardware, brick storehouse, warehouses, wagons, etc., appurtenances incident to a warehouse business in a thriving city. The court finds that, within a short time after said hardware business had been conveyed to the said Wittliff, the said Wittliff went to Walnut Springs, the residence of C. C. Rushing, and engaged the services of said Rushing to sell the said hardware business for him. That thereafter the said Rushing claimed to be the owner of said stock of goods and said property and claimed to have paid the said Wittliff for it, and claimed to be an innocent purchaser in good faith and without notice. The court finds that the ownership set up by the said Rushing to the said property was false and was fraudulent, and the said claim was made by the said Rushing in order to aid the said Wittliff to put said property beyond the reach of said Hoch. The court finds that said Hoch soon discovered that he had been swindled out of his property. That he had received nothing in exchange therefor, and he brought a suit against the said T. H. Wittliff to cancel said conveyances and secure a restoration of his property. That said suit was filed in the district court of Williamson county, and, as at that time the said Rushing was claiming said property to be his, he was made a party to said suit. That the same lawyers who represented Wittliff in that suit represented Rushing, and that the said Rushing was a witness in behalf of defendant Wittliff at the trial of said cause, and the said Hoch in said suit recovered back all of his property which he had conveyed to Wittliff, and, in the adjustment and settlement of certain equities between Wittliff and the said Hoch on account of certain indebtedness that the said Wittliff had paid of the said Hoch, it was agreed that a certain suit, which the said Rushing had filed in the district court of McLennan county against Hoch and Constable Olive of Williamson county, and a certain policeman of Waco, for the sum of $60,000, should be dismissed, and that it was dismissed. Wittliff was to pay said Rushing $1,000 which Rushing says he knew he would pay, though he admitted that he knew Wittliff was insolvent. The court finds that, at about the time that said Rushing was claiming to be the owner of the Hoch property at Taylor, a suit was filed by Hoch against Wittliff to recover said property; that at a conference between Wittliff and Rushing held at Cameron, the said Rushing and the said Wittliff entered into a contract in writing by which the said Rushing agreed to act for the said Wittliff and adjust all suits and claims against said Hoch property and also to sell the same and pay over the proceeds

to the said Wittliff, retaining for himself, the said Rushing, the sum of $1,500 for his services.

"(11) The court finds that, by a similar false and fraudulent representation and device and manipulation, the said Wittliff sold to Kautz Bros., who were young German boys, and one Geo. Baker, alias Max Holtz, the patent right to the state of Ohio for the sum of $20,000. That said Geo. Baker, alias Max Holtz, was a confederate of Wittliff, and it was stipulated that he was to pay one-fourth of the purchase price of the state of Ohio and that the other three Kautz boys were to pay $15,000. That the means used to induce the Kautz boys to invest in this property was similar in principle and method to that resorted to by the said Wittliff to induce the plaintiff's son to invest, though the details by which it was carried out were somewhat different. But the same was fraudulent, and by said fraud the said Wittliff induced ――――― Kautz, the father of the three boys, who purchased the state of Ohio with Geo. Baker, alias Max Holtz, to put up the purchase money, or at least the greater part of it, for his sons, to wit, about $15,000. The court finds that certain vendor's lien notes that the said Wittliff obtained from the Kautzes were used by him in conjunction with the purchase money obtained by Wittliff in the sale of plaintiff's land to Julius Wittliff to borrow $6,000 from a bank in Taylor, to be used by the said Wittliff in the hardware business obtained from Hoch, which was claimed by the said Rushing pretty soon after it was acquired by the said Wittliff. And the court finds as a fact that the use of the notes acquired from the Kautzes was thus indirectly used for the benefit of the said Rushing, and to enable the said Rushing to use in part the proceeds of said notes for the use and benefit of the said Wittliff.

"(12) The court finds as a fact that, in three of the fraudulent transactions of said Wittliff, the said Rushing was claiming parts of said property acquired in said transactions by the said Wittliff. That he was claiming as an innocent purchaser or lienholder. And the court finds from all the circumstances that these claims' were fraudulent, and that they were made for the purpose of aiding the said Wittliff in placing said property beyond the reach of or the recovery of the owners who had been defrauded out of the same. That while the said Rushing did not receive any of the property obtained from the Kautzes, yet he received the proceeds of the same, where it was put in the Hoch hardware business in Taylor; the said Rushing at that time claiming to be the owner of that property. The court finds as a fact from all of the facts and circumstances in the case that the said Rushing was engaged, not in the actual participation of these fraudulent trades, but that he was an accessory to them in being used as an instrument to hide the property or place it beyond the recovery of the owners as a part of the general scheme to defraud, and that the said Rushing, wherever he could, did aid the said Witliff in placing property thus fraudulently acquired beyond the reach of the owners, and as such he is liable to the plaintiff in this case.

"(13) The court finds that, by virtue of some secret agreement between the said Wittliff and the said Rushing, the said Rushing was to some extent interested in the proceeds of the property fraudulently acquired by the said Wittliff. The court finds that an intimate business relation exists between said Wittliff and the said Rushing. That at one time the said Rushing and the said Wittliff and Williamson and Robertson were engaged in selling state and county rights to a certain patented invention, known as the 'Little Giant,' which was a kind of lifting machine. And the court finds that, during the time of the transactions above set out, the said Wittliff was at Walnut Springs, the place of the residence of the defendant Rushing. That the distance between Walnut Springs and Brenham, Tex., the place where Wittliff made his headquarters, was over 200 miles, and that there is no evidence to show that the said Wittliff borrowed any money from the bank in the neighborhood of where he lived, but transferred the greater part of the property fraudulently acquired by him to the said Rushing under the claim that it was to secure an indebtedness due him by the said Rushing, which the court, from all the facts in the case, finds to be untrue. And the court finds that the plaintiff has tendered the right, which the said Wittliff conveyed to him to sell the Peacock bed braces, etc., in the state of Iowa and in Wisconsin, back to the said Wittliff.

"(14) The court further finds, among the circumstances to indicate and show the fraudulent relations existing between C. C. Rushing and said T. H. Wittliff, that the said Wittliff in distant states did send telegrams to said Rushing inquiring about the solvency of one L. B. Robertson, alias Sam Robertson, alias S. M. Robertson, one of the co-conspirators in this scheme of defrauding in order to effectuate the sales of this bed brace.

"(15) The court further finds, as another circumstance, that the said Rushing knew and met him at Waco, and the said Holtz, alias Baker, and knew that he was passing under these several names.

"(16) The court finds as a fact that the said Rushing, either actually knew, or was in a position to know, these entire fraudulent schemes as developed by these facts.

"(17) The plaintiff's petition charged the existence of a partnership between Rushing and Wittliff, and the defendant Rushing did not deny this allegation under oath; but I have treated this matter entirely independent of this feature of the case.

"Conclusions of Law.

"The court finds as a conclusion of law from all the facts herein stated that the defendants T. H. Wittliff, Julius Wittliff, and C. C. Rushing are liable to the plaintiff in the following amounts, to wit:

"$3,000 which the plaintiff was compelled to pay to relieve his land of the lien that had been fastened upon it by the sale of the same by T. H. Wittliff to Julius Wittliff, as hereinbefore set out. Plaintiff is entitled to recover from the defendants the sum of $1,500 cash paid to the said Wittliff; that the plaintiff is entitled to recover the vendor's lien notes of Frank Haubolt or their value in the sum of $1,705. Plaintiff is entitled to recover $1,087.20, the value of 17 bales of cotton. Plaintiff is entitled to recover $495, the value of three horses. Plaintiff is entitled to recover $208, the value of eight head of cattle. Plaintiff is entitled to recover legal rate of interest as prayed for at the rate of 6 per cent. per annum from the 26th day of December, 1906, until date of judgment hereof. If said notes are restored by the defendants to the plaintiff, then the defendants are entitled to credit for that amount. The court cancels the deed from Spreen to Wittliff and from T. H. Wittliff to Julius Wittliff.

"The court divests title of this Peacock bed brace out of the plaintiff and reinvests it in the said Wittliff."

To all of which the defendant Rushing excepts.

Appellant has presented several assignments of error, raising in different forms the question of the sufficiency of the testimony to support the judgment; and, after due consideration, we have reached the conclusion that the case should be reversed and appellant awarded another trial. While the plaintiff may have had a different and sufficient cause of action against the Wittliffs, his cause of action, if any, against appellant Rushing, was founded upon the charge that Rushing had entered into a conspiracy with the Wittliffs, and that the plaintiff had been defrauded in pursuance of that conspiracy, or that Rushing, having knowledge of the fraud perpetrated upon plaintiff, had aided the Wittliffs in placing some of the property obtained from the plaintiff where it could not be recovered. T. H. Wittliff, the active perpetrator of the alleged fraud, testified by written deposition for the plaintiff. The substance of his testimony was that during the year 1906 he made a trade with one Pinter in Burleson county, by which he sold Pinter the right to sell Peacock bed braces in the state of Illinois for certain lands in Burleson county, which lands he afterwards deeded to appellant Rushing; that in the year 1907 he sold to H. Hoch and his two sons the right to sell the Peacock bed brace in the state of New York, and received as consideration therefor a store-house, warehouse, stock of hardware, notes and accounts, and certain horses and wagons in Taylor, Tex., and thereafter transferred them to C. C. Rushing, with the understanding that he was to sell them and receive as compensation for his services $1,500; that in 1906 he engaged in a transaction with H. F. Spreen, the plaintiff in this suit, in which he sold to Spreen the right to sell the Peacock bed brace in the state of Iowa for certain lands, notes, horses, cattle, etc., in Austin county; and that he transferred one of the notes, amounting to about $1,700, to the defendant Rushing. He further testified that the note referred to and the Burleson county land referred to were transferred to Rushing to secure money borrowed by him from Rushing. He also testified that Rushing had no interest in the transactions the witness had with the Hochs, Pinter, or Spreen until after the trades were made. On cross-examination the following questions were asked T. H. Wittliff, and he made the following answers: "Please state whether or not Mr. Rushing ever received any profits from any sale made by you of the Peacock bed brace patent, or any other patent." The witness answered: "Yes, to a certain extent." Cross-interrogatory 10: "Please state whether or not C. C. Rushing knew anything of any sales of any patents made by you to any person, or ever helped you conceal the proceeds of same after said sales were made." To which the witness answered: "Yes, to a certain extent." There was other testimony showing that the witness and Rushing had several years before been interested in another patent, and therefore the witness could not truthfully have given a negative answer to either of the questions referred to. In other words, there was other testimony tending to show that Rushing knew of sales by Wittliff and had received profits therefrom of another and different patent. In view of that fact and the previous statement of the witness that the note received by him from the plaintiff and transferred to Rushing and the Burleson county land which he had transferred to Rushing were so transferred for the purpose of securing indebtedness for borrowed money, his explanation of Rushing's connection with the Hoch property, and his statement that Rushing never had any interest in the patent known as the Peacock bed brace, it is by no means certain that, in giving the answers he did to the cross-interrogatories, Wittliff intended to convey the impression that Rushing had any improper connection with the transactions referred to.

Appellant Rushing took the stand as a witness and denied that he was a party to any agreement or scheme to defraud the plaintiff or any one else, and denied any knowledge of the sales by Wittliff of the patent rights referred to until after they had been made. He testified that, acting for a private bank, of which he was one of the part-

ners, he had loaned Wittliff money on the Burleson county land, and had also loaned him money and taken the Spreen note as security for the latter loan. As to the Hoch transaction, his testimony was to the effect that, after Wittliff had acquired the property from the Hochs, he offered to sell it to him; that he went to Taylor to make investigations with a view to buying the property, but, having ascertained that the Hochs were contesting Wittliff's title, he declined to purchase it and entered into an agreement by which he undertook to adjust the matter between Wittliff and the Hochs, for which service, if successful, Wittliff was to pay him, $1,500. He first denied that he claimed the Hoch property when he reached Taylor as his own, but afterwards admitted that he had stated to certain persons that he had bought it and paid for it. There was proof of some other circumstances tending to show a willingness on Rushing's part to assist Wittliff; but they do not necessarily lead to the conclusion that Rushing was a party to whatever fraud Wittliff had perpetrated on the plaintiff. However, if the trial judge's finding that Rushing was a conspirator and a party to the scheme by which Spreen was defrauded had been based solely upon testimony tending to support that conclusion, we might not feel called upon to reverse the case; but his written findings of fact and conclusions of law show that in reaching that conclusion he considered many facts previously set out in his written findings that were not proved by the testimony as reflected in the statement of facts agreed to by the parties and approved by the judge. The findings referred to are unusually elaborate, and include every material and many immaterial matters alleged in the plaintiff's petition. Comparing the findings of fact with the testimony, we find that the former are not supported by the latter in the following respects:

1. The second finding includes a statement that the Peacock bed brace was a worthless invention. We find no evidence in the statement of facts that will support that finding. No witness gave a full description of it, and the testimony fails to show that it would not accomplish the purpose indicated by its name. The plaintiff's son, an inexperienced youth, testified that he was unable to sell it in the state of Iowa; and two other witnesses testified to unsuccessful efforts on their part to sell it, one in Ohio and the other in New York. They did not state whether they were trying to sell territory to subagents, or trying to sell the brace to be used by the purchaser; and no witness testified that the brace would not serve any useful purpose and was without value. It may not have been worth as much as the witnesses referred to tried to sell it for, and yet it may have had some value. The mere fact that three witnesses, going from Texas into distant states, have failed to sell a new invention, does not prove that it has no value. Some men are so lacking in skill as to be unable to sell a meritorious article, while others are so well skilled in that regard as to make profitable sales of the same article. The witnesses who attempted to sell this invention in the states referred to were not shown to have been skilled in that character of work; but, on the contrary, the record indicates that they were all young and inexperienced.

2. In the third paragraph the court found that one Baxter Shemwell was a party to the conspiracy entered into by the Wittliffs, Rushing, and others for the purpose of cheating and defrauding the public generally. The name of Baxter Shemwell is not mentioned in the statement of facts, nor elsewhere in the entire record, except in the plaintiff's petition, where it is charged that he was a party to the scheme to defraud the public.

3. In the fourth paragraph the court found "That said Wittliff and said Holtz did not sell said bed braces, but would go around, and either induce persons to allow said braces to be put upon their beds free of charge, or would give the money to such parties to buy said bed braces, when the son of the plaintiff or one similarly engaged could come around to put said braces on beds." We find no testimony in the record that will support that finding. On the contrary, the testimony shows that Wittliff and Holtz put braces on beds in hotels in Houston, Galveston, Waco, and Temple; and, in some instances, the plaintiff's witnesses testified to seeing the money paid for putting the braces on, and stated that they did not know who furnished it.

4. The eighth finding of fact includes this statement: "And the court further finds that Kountz and plaintiff paid the Taylor Bank the note given by T. H. Wittliff in order to protect the vendor's lien that Kountz had transferred to Wittliff, and the notes given by Julius Wittliff to T. H. Wittliff, which covered a lien against the 152 acres of Spreen's land, and that plaintiff paid $3,000 to protect and rescue his land and Kountz and Spreen each paid $3,000." In so far as that finding relates to Kountz, it is not supported by the testimony. The statement of facts fails to show that any note obtained by Wittliff from Kountz was ever deposited in any bank, and fails to show that Kountz ever paid any sum on any such note.

5. So much of the ninth finding of fact as finds that Wittliff's sale of the right to sell the Peacock bed brace in the state of Illinois to Pinter and others was fraudulent, and that the land thereby obtained from Pinter was fraudulently acquired by Wittliff, is not sustained by the testimony. The only testimony in reference to that transaction was given by T. H. Wittliff and the defendant Rushing. T. H. Wittliff testified that he sold to Pinter and others the right

to sell Peacock bed braces in the state of Illinois for certain lands in Burleson county, which he afterwards deeded to Rushing to secure a loan of money, and that, if there was any fraud in that transaction, Rushing knew nothing of it. He also stated that thereafter, and at his request, Rushing conveyed the same land to Pinter's brother and a party by the name of Mugge, and that he left the notes given in part payment for the land with Rushing to secure him for the debt the witness owed him. He said Rushing did not know at that time that there was any trouble over the land, and when he learned there was trouble about it he surrendered the notes to Wittliff and demanded other security. Rushing testified concerning the Pinter matter as follows: "I knew nothing about any transaction with Wittliff and Mr. Pinter before that trade was made. Wittliff wanted to borrow some money, and told me he had property in Burleson county, and I asked him what kind of property it was, and he showed me the deeds. I believe he said there was a lawsuit about it now, and I told him that, if he would have it dismissed, I would lend him some money on it, and he proposed to pay my expenses if I would go look after it. I got on the train and went from Brenham to Caldwell. The party was there and went to the courthouse and had the suit dismissed, and I proposed that I take a deed for the land, and he said, 'All right,' and deeded me the land. A few days later he said to me, 'You might never deed that land back to me.' I told him I would whenever he paid the money that he owed me, and we drew up a statement to that effect. I think it was a few days afterwards that this statement was made. There was a suit filed on this land, as well as I remember. I think I deeded one tract away, and a suit was filed after that. I phoned Wittliff a suit had been filed for the recovery of the land, and I wanted him to take the land back and give me better security. I think a citation was issued on me. I then signed these notes back to Wittliff, and he gave me personal security. * * * I can't remember when it was that Wittliff came to me and wanted to borrow money on the Burleson county land. I think it was $1,500 he borrowed. I don't know how much land he had. I deeded the land to Mugge and others, I believe. It is not a fact that Wittliff compromised with them on the swindle; one of the conditions being that I should deed the land back to him. I held the notes as collateral. I don't remember who bought them."

The statement of facts contains no other testimony in reference to the Pinter transaction, and that referred to falls short of showing that Wittliff perpetrated a fraud on Pinter or any one else in reference to the Burleson county land. It shows that the lands were deeded by Pinter to Wittliff, and by Wittliff to Rushing, and by Rushing to Pinter's brother and one Mugge, which latter conveyance was made at the request of Wittliff; but those facts do not authorize a finding that Wittliff had perpetrated a fraud on Pinter. It also appears that some one brought suit against Rushing for the land, but who that person was is not disclosed by the testimony. It may have been Pinter, and it may have been some one else; but the mere fact that some person instituted suit against Rushing to recover the Burleson county land does not show, or tend to show, that Wittliff had perpetrated a fraud upon Pinter or any one else. In fact, it was not shown that Pinter ever claimed to have been defrauded.

6. The tenth finding of fact, so far as it finds that the transaction between Wittliff and the Hochs was fraudulent, by reason of any acts of or false representations made by Wittliff, is not supported by the testimony. Wittliff testified that he had a transaction by which he sold the three Hochs the right to sell the bed brace in the state of New York, and received as a consideration therefor the property in Taylor referred to in the tenth finding. Henry Hoch, Jr., the only other party to that transaction who testified in this case, failed to state that he or either of the other Hochs were in any wise deceived or misled by anything that was done or said by Wittliff or any one else. He testified as to numerous transactions between himself and Wittliff, which finally led up to the purchase by the witness and his father and brother of the right to sell the bed brace in the state of New York, and stated that the property in Taylor was conveyed to Wittliff as the result of that transaction, and that thereafter he went to New York, failed to sell the brace, and, after being gone about a month, returned home. He also stated that his father brought suit against Wittliff and Rushing and recovered the Taylor property. There was no other testimony tending to show what occurred between Wittliff and the Hochs, and, for aught that appears, there may have been no misrepresentations or deceit on the part of the Wittliffs, and there may have been a contract of guaranty by Wittliff, as in a former sale, of right to sell in two other states, an agreement, such as the plaintiff, Spreen, testified existed between him and Wittliff, to the effect that if the Hochs were not able to sell the bed brace in the state of New York, and were dissatisfied, Wittliff would rescind the entire transaction; and the suit by which the witness said his father recovered the property may have been based upon such ground, and not upon the ground of fraud. At any rate, the proof fails to show that Hoch recovered the property because it had been fraudulently obtained from him; and, as said before, there

was no other testimony tending to show that either of the Hochs had been misled or deceived by anything done by Wittliff or any one else, nor does the testimony show that the same lawyers represented both Wittliff and Rushing in the Hoch case, as found in the tenth finding of fact.

[1] 7. So much of the eleventh finding of fact as holds that the sale to the Kautz brothers of the right to sell the bed brace in the state of Ohio was induced by fraudulent representations is also unsupported by testimony. The only witness who testified in reference to that transaction was Richard Kautz, and, while he recites a number of preliminary matters, including putting braces on beds in hotels at Waco and Temple, and in one instance receiving pay therefor himself, and to sales, or pretended sales, by Geo. Baker, alias Max Holtz, and others of certain county rights to sell the bed braces, including the sale by the witness of McLennan county to a well-known attorney of Waco for a consideration of $690, and the purchase from Wittliff by the witness and Geo. Baker of the right to sell the brace in Oklahoma and the Indian Territory, and the subsequent sale of that right to Sam Robertson, one of the alleged conspirators, and finally the purchase from Wittliff by the witness and his two brothers of the right to sell the brace in the state of Ohio, for which they paid $15,000 in money and notes for a three-fourths interest, Geo. Baker being the supposed purchaser of the other one-fourth interest, the witness nowhere states that he was in any wise deceived or misled by anything that had been or was at that time said or done by Wittliff or any one else. When it is alleged that a person has been deceived and misled by what some other person has done or · said, no one can know as well as the person alleged to have been deceived whether or not such was the case; and when such person is put upon the stand as a witness, and the party who alleged that he was deceived fails to call upon him to answer in the affirmative or negative in that regard, the conclusion that he was deceived and defrauded ought not to be indulged, although it may appear that he has made an unwise trade.

8. Also the findings in the eleventh and twelfth paragraphs to the effect that certain notes obtained by Wittliff from the Kautzes were used by him to borrow money at a bank, which money was afterwards put into the hardware business obtained from Hoch, is not supported by any testimony found in the statement of facts. That finding, like the others pointed out above, finds no basis in the testimony.

The judge's findings of fact and conclusions of law indicate that he considered most of the findings above referred to and not established by testimony in reaching the conclusion that Rushing was liable to the plaintiff. The statement of facts was agreed to by the parties and approved by the judge, and why there should be such lack of harmony between it and the court's findings of fact we are not able to determine. We note the striking similarity between the plaintiff's petition and the findings of fact, including the immaterial finding of the residences of the parties; and we fully concur with plaintiff's counsel in the statement in their brief that the trial judge's findings "fully reflect the pleading of appellee." But the point is that they do not properly reflect the proof, and indicate that, in reaching a decision, the judge was influenced by facts alleged but not proved.

[2] While it is true that the plaintiff charged in his petition that Rushing was a partner in the unlawful scheme, it was not necessary for the defendant in his answer to deny that allegation under oath. The word "partner," in the sense used in the plaintiff's petition, is synonymous with the word "co-conspirator"; and the petition did not allege such partnership as the statute requires to be denied under oath.

For the reasons indicated, we have reached the conclusion that, conceding proper motives to the trial judge, nevertheless it must be held that the case was not tried with that care and discrimination which both parties were entitled to have bestowed upon it; and, for that reason, the judgment will be reversed, and the cause remanded for another trial as to appellant Rushing, and in all other respects affirmed.

Affirmed in part, and in part reversed and remanded.

### On Motion for Rehearing.

JENKINS, J. Upon a former day of the present term of this court, we reversed and remanded this case for the reason that the evidence was insufficient to sustain the judgment. After carefully re-examining the record in this case, a majority of this court has concluded that we were in error · in this regard.

[3] In said opinion, which is here referred to, there is set forth findings of fact by the trial judge. The case was tried before the court without a jury, and, under the well-known rules of law, said findings of fact should be given the same weight in this court as special findings of fact by a jury. In our previous opinion we reviewed a number of these findings, giving our reasons for believing that the same were not sustained by the evidence.

[4] As to the second finding by the court, we said that the testimony was insufficient to show that the Peacock bed brace was a worthless invention. It was so alleged in plaintiff's petition, and, to our minds, conclusively shown in a number of instances, that Wittliff resorted to fraud and misrepresentation for the purpose of selling state

and county rights for said bed brace. It was shown that he had been sued in other cases, and recovery had against him. It is true it was shown that in some instances he had put these bed braces on beds in hotels; but no witness was called to testify that these bed braces had any value. In the testimony of a number of witnesses it is assumed, rather than distinctly stated, that these bed braces were worthless. None of these witnesses appear to have been challenged on this assumption, and no testimony to the contrary was offered. From these circumstances we do not feel justified in saying that the court erred in finding that said bed brace was a worthless invention. Appellant seems in effect to concede this in his brief. No proposition was submitted by him to the effect that the court erred in finding said bed brace to be a worthless invention.

As to the eighth finding of fact with reference to the transaction with Kountz, Richard Kountz testified that Wittliff hired him to go with him to assist in the sale of the bed brace; that after certain transactions, either real or simulated, and probably the latter, he convinced young Kountz that the bed brace was a salable article, and through him interested his father; that he sold Richard Kountz and one George Baker, alias Max Holtz, who is shown to be one of his co-conspirators, the territory of Oklahoma and the Indian Territory for $9,000; that young Kountz obtained $4,500 of said amount from his father, said Baker pretending to pay the other half; and that Baker, a few days thereafter in the city of Dallas, pretended to make a sale of this territory for $11,000 to one L. B. Robertson, claiming to be a rich ranchman, living near Oklahoma City, but who in fact was one Sam Robertson, another of Wittliff's co-conspirators living near Walnut Springs, where appellant Rushing resides; that this transaction was so manipulated that Kountz received no part of this $11,000 ($10,000 of which was paid by a check given to Baker, but which, so far as the record shows, was never presented), but reinvested his interest in the same, together with said Baker, in the purchase of the state of Ohio for the sum of $20,000, of which old man Kountz was induced to become responsible for $15,000, the said Baker pretending to pay the other $5,000. Baker and young Kountz went to Ohio to try to sell the bed brace, but Baker deserted Kountz, and Kountz, after trying to sell the bed brace and being unable to do so, returned home.

[5] We think we were in error in stating, as we did, in said opinion, that the ninth finding of fact was unsupported by the evidence. It is true that the evidence is very meager as to the transaction with Pinter; but it does show that Wittliff sold Pinter the right to sell said bed brace in the state of Illinois for certain lands in Burleson county; that he afterwards deeded said land to Rushing, and, subsequent thereto, that suit was brought against Rushing to recover said land; that Rushing, at the request of Wittliff, reconveyed said land to Pinter's brother and a party by the name of Mugge; that prior to this Rushing had transferred one tract of this land, taking vendor's lien notes for the same, and that in the settlement of the suit brought for the recovery of the land he surrendered these notes.

[6] As to the tenth finding of fact, we think the testimony, taken altogether, justifies the finding that the transaction with the Hochs was fraudulent.

[7] In said opinion we made the following statement: "The judge's findings of fact and conclusions of law indicated that he considered most of the findings above referred to and not established by the testimony, in reaching the conclusion that Rushing was liable to the plaintiff"—and reversed the case for the reason that the court had considered facts which we did not deem were established by the evidence. As to some of these specific findings of fact, as above stated, we think we were in error; but for another reason we think the judgment of the court below should not be reversed, and that is that the appellant did not assign error upon the specific findings of facts by the court. If the facts are as found by the court, the proper judgment was rendered. The only thing that can be considered in behalf of appellant is that the testimony is insufficient to sustain the judgment. The testimony abundantly establishes the fact that T. H. Wittliff was engaged in a conspiracy to defraud the public in general, and appellee Spreen in particular, by the means set out in the court's findings of fact, which appear in our previous opinion.

[8] The only question, to our mind, that should be considered, is: Does the testimony sustain the finding of the court that appellant Rushing was connected with this fraud in such a way as to make him responsible in this suit? In support of this the evidence shows that Wittliff lived in Washington county, and Rushing lived in Bosque county; that they were acquaintances and had formerly been engaged together in the sale of another patent right owned by Rushing; that, when Wittliff made the sale in question to Spreen, he obtained from Spreen as a part of the consideration two vendor's lien notes, amounting in the aggregate to $1,705, and 152 acres of land of the value of $5,472, which he fraudulently transferred to his brother, taking in payment therefor a note for $3,000. These notes for $1,705 were transferred to appellant Rushing. The land obtained by Wittliff from Pinter in Burleson county was deeded to said Rushing. Rushing claims that said notes and said deed were taken as security for money which he loaned to Wittliff, but he was unable to state any of the details of his transactions with

Wittliff in this regard, and did not produce his books or any memorandum thereof showing when he loaned Wittliff the money, or in what amounts. He says that when he learned of the trouble he delivered these notes to Wittliff's attorney, and that, when suit was brought against him in Burleson county to recover the land, he reconveyed the same at Wittliff's request, and took other security for his loans. He does not indicate what other security he took, nor give any detailed statement with reference to this transaction, such as would be expected from a defendant who had been charged with fraud, if there was no fraud in such transactions.

Wittliff sold to the Hochs the right to sell said bed brace in the state of New York, and received as a part of the consideration a hardware business, situated in Taylor, consisting of a stock of hardware, brick storehouse, warehouses, wagons, etc. The Hochs, alleging that they had been swindled, sought to recover this property. Rushing appeared upon the scene and claimed that he was the owner of the same; that he was an innocent purchaser and had paid his money for the same. He admitted in this trial making said statement, and admitted that said statement was false.

It thus appears that, in three swindling transactions in which Wittliff was engaged, Rushing was claiming a part of the proceeds in such a way that, if his claim was true, he would have been an innocent purchaser and entitled to hold the same; but his claim as to the Taylor property is admitted to be false, and the circumstances as to his claim in the other transactions look "shady," to say the least of it.

We find Wittliff phoning Rushing in the presence of one of his victims as to the financial standing of L. B., alias Sam, Robertson, above referred to, who lived near Walnut Springs, where Rushing resided, and who the evidence indicates was one of Wittliff's co-conspirators. After suit was brought by the Hochs to recover the Taylor property, Rushing abandoned his claim of having purchased said property, and entered into a written agreement with Wittliff to represent him in trying to hold said property. Subsequently, Wittliff was arrested in Waco; Rushing was with him, and the constable testifies that Rushing, after holding a whispered conversation with Wittliff, attempted to make off with Wittliff's handgrip in which was this written agreement, and that, when Rushing was stopped and the handgrip taken from him, Wittliff took the same and attempted to destroy this agreement in the presence of Rushing.

It is true, as stated in our previous opinion, that the deposition of Wittliff was taken, and that he testified that appellant Rushing had no interest in the transactions of said witness with the Hochs, Pinter, or Spreen until after trades were made; but upon cross-examination, in answer to the question, "Please state whether or not Mr. Rushing ever received any profits from any sale made by you of the Peacock bed brace patent, or any other patent," the witness answered, "Yes, to a certain extent." Cross-interrogatory 10, "Please state whether or not C. C. Rushing knew anything of any sales of any patents made by you to any person, or ever helped you conceal the proceeds of the same after said sales were made," to which the witness answered: "Yes, to a certain extent." We stated in said opinion that, inasmuch as the evidence showed that the witness had previously been interested with Rushing in another patent, he could not truthfully have answered said questions otherwise than he did. Upon reflection we believe that we were in error in this. If the witness had understood said questions as applying to the patent formerly sold by himself and Rushing, he might have answered the first question as he did; but, in such case, why should he have answered the second question that Rushing had helped him to conceal the proceeds of the same after said sales were made? There is nothing to indicate that there was ever any trouble over the other patent or any reason for concealing the proceeds of such sale; and we are constrained to believe that the witness answered these questions with reference to the transaction then under investigation. It is significant that, though this deposition was on file, Rushing did not attempt to further interrogate said witness by deposition or otherwise as to what he meant by said answers.

Looking to the whole of the testimony, we do not feel justified in setting aside the conclusion of fact arrived at by the court that Rushing was fraudulently connected with the transaction in which there can be no question that appellee Spreen was swindled by the sale to him of said bed brace.

For the reasons above given, the motion for rehearing is granted, and the judgment of the court below is affirmed.

KEY, C. J. (dissenting). Being unable to concur with my Associates as to the disposition now made of this case, I refer to my former opinion as indicating some of the reasons for my dissent. While it is true that appellant's assignments of error do not specifically and in detail controvert each and every finding of the trial court, they present the proposition that the verdict is not sustained by the testimony, and I believe that proposition is sound. Appellee put in evidence the deposition of Wittliff and relied mainly upon his testimony. He swore positively that appellant never had any interest in the Peacock bed brace, knew nothing about the transaction between him, the witness, and appellee until after it occurred, and that his only connection with the property obtained by the witness from appellee

was that the witness transferred to appellant land notes received from appellee to secure appellant's bank for a loan of money. Appellant's testimony was to the same effect, with the additional statement that, after he heard of the trouble between appellee and Wittliff, he returned the note to Wittliff's attorney and demanded and received other security. The facts and circumstances relied on to overcome the distinct and positive testimony referred to do not appear to me to be any stronger than those relied on in Joske v. Irvine, 91 Tex. 583, 44 S. W. 1003, where our Supreme Court said: "The broad and wise policy of the law, formed in and descending to us through the crucible of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the great responsibility of determining, as a question of law, whether the testimony established more than a mere surmise, suspicion, or inference." It was held in that case that it did not, and I believe it should be so held in this case. I adhere to the statements and conclusions announced in our former opinion.

It is believed that the assignment which charges that the verdict is contrary to and not supported by the testimony authorizes this court to pass upon all the findings of the trial court, and to disregard those that are not sustained by testimony.